MERRICK B. GARLAND
Attorney General
KRISTEN CLARKE
Assistant Attorney General
SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section
JON M. SEWARD
Principal Deputy Chief, Housing and Civil Enforcement Section
CARRIE PAGNUCCO
Deputy Chief, Housing and Civil Enforcement Section
SARA L. NILES (MA Bar No. 634257)
KINARA A. FLAGG (NY Bar No. 5092143)
Trial Attorneys
    U.S. Department of Justice, Civil Rights Division
    950 Pennsylvania Ave. NW – 4CON
    Washington, D.C. 20530
    Telephone: (202) 514-4713, Facsimile: (202) 514-1116
    Email: Sara.Niles@usdoj.gov

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Chief, Civil Division
RICHARD M. PARK (CA State Bar No. 236173)
Chief, Civil Rights Section, Civil Division
KATHERINE M. HIKIDA (CA State Bar No. 153268)
Assistant United States Attorneys
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-2285, Facsimile: (213) 894-7819
    E-mail: Katherine.Hikida@usdoj.gov

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY NATIONAL BANK,<br><br>Defendant. | Case No. 2:23-00204<br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL**<br><br>Hon.<br>United States District Judge |

# COMPLAINT

Plaintiff, the United States of America ("United States"), alleges as follows:

## I. INTRODUCTION

1. The United States brings this action against City National Bank ("City National" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§3601-3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-16911f.

2. The FHA and ECOA prohibit creditors, such as banks, from discriminating in home loans or other residential credit transactions on the basis of race, color, national origin, and other characteristics.

3. "Redlining" is one type of discrimination prohibited under the FHA and ECOA and ECOA's implementing regulation, known as "Regulation B," 24 C.F.C. pt. 100, 12 C.F.R. pt. 1002. Redlining occurs when lenders deny or discourage applications or avoid providing loans and other credit services in neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4. From 2017 through at least 2020 (the "Relevant Time Period"), City National Bank engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, City National avoided providing home loans and other mortgage services in majority-

Black and Hispanic neighborhoods in the Los Angeles Metropolitan Division ("Los Angeles MD" or "Los Angeles County").[1]

5. City National maintained only three of its 37 branches in majority-Black and Hispanic neighborhoods during the Relevant Time Period, despite the fact that well over 50 percent of census tracts in Los Angeles County are majority-Black and Hispanic. The Bank relied on unmonitored "relationship managers" to generate applications largely from its existing customers, who are disproportionately white, instead of marketing or advertising its loan products and services in majority-Black and Hispanic areas. City National also failed to train or incentivize its lending staff to compensate for its lack of branches, and failed to provide adequate staff resources to serve the mortgage lending needs of residents in majority-Black and Hispanic neighborhoods.

6. Further, during the Relevant Time Period, the Bank's internal fair-lending oversight, policies, and procedures were inadequate to ensure that the Bank provided equal access to credit to residents of majority-Black and Hispanic neighborhoods. Moreover, City National failed to act on internal reports indicating fair lending and redlining risk. Despite its capacity to hold affordable loan products in its portfolio, City National did not develop or offer any affordable loan products.

7. As a result of the above-described conduct and practices, the Bank generated disproportionately low numbers of loan applications and home loans during the Relevant Time Period from majority-Black and Hispanic neighborhoods in the Los Angeles MD compared to similarly-situated lenders.

8. City National Bank's conduct and practices were intended to deny, and had the effect of denying, residents of majority-Black and Hispanic neighborhoods equal

---

[1] The complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably to mean a census tract where more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau.

access to home loans and otherwise discouraged these residents from applying for home loans. The Bank's conduct was not justified by a business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C.§ 1691e(h) because the action arises under the laws of the United States, and the United States brings this case as a plaintiff.

10. Venue is proper in this Court under 28 U.S.C. § 1391 and in this division because a substantial part of the events or omissions giving rise to the claims occurred in this District and division.

## III. PARTIES

11. Plaintiff United States brings this action to enforce the provisions of the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

12. Defendant City National Bank is a national bank headquartered in Los Angeles, California that offers commercial, consumer, mortgage, and wealth management banking services. As of April 30, 2022, the Bank had total assets of $90.9 billion and operated 79 branches in California, Delaware, Florida, Georgia, Massachusetts, Minnesota, Nevada, New York, Tennessee, Virginia, and the District of Columbia. Los Angeles County is, by far, City National's largest market where it maintains 80 percent of its deposits and presently operates 33 of its branches. City National is the largest bank headquartered in the Los Angeles MD. City National is a wholly-owned subsidiary of RBC USA Holdco Corp. ("RBC").

13. City National is subject to the regulatory authority of the Office of the Comptroller of the Currency ("OCC"). Because its assets exceed $10 billion, City National is also regulated by the Consumer Financial Protection Bureau.

14. City National is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100 and 12 C.F.R. pt. 1002.

15. City National is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and is engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

### IV. FACTUAL ALLEGATIONS

**A. The Los Angeles MD and City National's Assessment Area**

16. During the Relevant Time Period, the Los Angeles MD encompassed all of Los Angeles County, which is the most populous county in the United States.

17. The Los Angeles MD has over 10 million residents. According to 2015 data from the United States Census Bureau, the region's residents are 27 percent non-Hispanic white ("white"), 48 percent Hispanic or Latino, eight percent Black, and 14 percent Asian. The Los Angeles MD has 2,346 census tracts of which 1,294, or approximately 55 percent, are majority-Black and Hispanic.

18. As a depository bank, City National is subject to the requirements of the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901-2908, and its enabling regulations, which require most banks to meet the credit needs of the communities that they serve. Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment areas." Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community. As of 2016, the Los Angeles MD was City National's largest assessment area.

5

**B.    City National's Los Angeles MD Branches Do Not Meet the Needs of Majority-Black and Hispanic Neighborhoods**

19.    During the Relevant Time Period, City National operated 37 branches in the Los Angeles MD. As of April 2022, 33 of these branches remain open and operational. *See* Exhibit A.

20.    Although 55 percent of the census tracts in the Los Angeles MD are majority-Black and Hispanic, throughout the Relevant Time Period, the Bank maintained only three branches in majority-Black and Hispanic areas.

21.    Of the 11 branches that City National opened or acquired in the Los Angeles MD in the last 20 years, only one branch, the Crenshaw branch, is located in a majority-Black and Hispanic neighborhood.

22.    Each City National branch offers traditional banking services, including deposits and check cashing. Most branches are staffed with at least two or three, but up to as many as ten, relationship managers who report to the branch manager and are assigned to service the Bank's clients who are associated with that branch.

23.    Unlike the Bank's other branches, the Crenshaw branch is staffed by just one relationship manager. Neither that relationship manager, nor anyone else at this branch, is charged with increasing mortgage lending in the surrounding community.

24.    City National knew its branches were not serving the credit needs of majority-Black and Hispanic communities by generating mortgage applications or originating mortgage loans, but did not take steps to address this failure.

**C.    City National's Marketing Is Focused on its Existing Customer Base**

25.    Until late 2016, City National described itself as a commercial bank that made mortgage loans as an accommodation to its commercial, high net worth, and entertainment clients. City National offered residential mortgage loan products only as a way to "grow its client relationships" with its existing customers. Until late 2016, City National's prudential regulator, the OCC, considered City National to be an "accommodation lender," meaning that the Bank generally made mortgages available only

as an "accommodation" to its existing client base, and offered mortgage loans "ancillary to a larger commercial relationship." Because of this, when evaluating the Bank's overall lending performance under the CRA, the OCC did not factor in City National's mortgage lending practices.

26. After its acquisition by RBC in 2015, City National sought to expand its mortgage lending to prospective clients. In early 2017, the Bank relinquished its "accommodation lender" status and began expansion toward a 50-state mortgage platform to gain market share in residential mortgages and establish the Bank as a mortgage lender.

27. Since early 2017, in accordance with its plans to grow its residential lending, the Bank significantly increased its residential mortgage lending, largely in majority-white census tracts. The Bank did not engage in marketing intended to increase residential mortgage lending in majority-Black and Hispanic census tracts.

28. City National's operations, including its marketing practices, remain largely unchanged since the Bank relinquished its "accommodation" status. City National has continued to focus on marketing to its existing client base rather than take steps to reach majority-Black and Hispanic tracts or borrowers.

29. During the Relevant Time Period, City National relied on unmonitored "relationship managers' to generate mortgage loan applications instead of marketing or advertising its loan products and services in majority-Black and Hispanic areas. City National neither directed nor trained its relationship managers to expand the Bank's residential mortgage marketing to reach the underserved majority-Black and Hispanic neighborhoods within its assessment areas.

30. During the Relevant Time Period, City National took no steps to market, conduct outreach, or otherwise encourage mortgage loan applications from majority-Black and Hispanic areas.

**D.     City National Offers No Affordable Loan Products**

31. The median income in majority-Black and Hispanic portions of the Los Angeles market is less than half of the median income in majority-white census tracts.

7

32. City National does not offer, and has never offered, any affordable loan products, despite its substantial capital and capacity to originate and hold loans on its books. This ability to hold loans in its portfolio would allow City National to offer a non-conforming affordable loan product that could be desirable in majority-Black and Hispanic neighborhoods.

33. Instead, City National offers and funds only those mortgage loan products specifically designed to service its target market of "high net-worth" individuals.

34. City National represented to its regulator that it intended to develop and offer an affordable mortgage loan product in 2019. To date, the Bank still offers no affordable mortgage loan product.

**E.     City National Receives Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods in the Los Angeles MD**

35. City National's policies and practices alleged herein have discouraged applicants in majority-Black and Hispanic neighborhoods in the Los Angeles MD from applying for and obtaining home loans and other mortgage-related services.

36. City National's own data on loan applications and originations that it is required to report to regulators under the Home Mortgage Disclosure Act of 1975 ("HMDA"), 12 U.S.C. §§ 2801-2811, confirms that City National has avoided serving majority-Black and Hispanic neighborhoods in the Los Angeles MD. *See* Exhibit B.

37. Between 2017 and 2020, City National significantly underperformed its "peer lenders" in generating home mortgage loan applications from majority-Black and Hispanic areas in the Los Angeles MD. "Peer lenders" are similarly-situated financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home mortgage loan applications.

38. The disparity between the rate of applications generated by City National and the rate generated by its peer lenders from majority-Black and Hispanic areas is both

statistically significant – meaning unlikely to be caused by chance – and sizable across the time period of 2017 to 2020.

39. City National received 8,593 HMDA-reportable mortgage loan applications within the Los Angeles MD from 2017 through 2020. Of those applications, eight percent came from residents of majority-Black and Hispanic census tracts. By contrast, during the same time period, City National's peers generated 46 percent of their applications from majority-Black and Hispanic census tracts.

40. In other words, City National's peers generated close to six times the number of mortgage loan applications from residents of majority-Black and Hispanic census tracts than did City National. These disparities are statistically significant – meaning, unlikely to have been produced by chance – across the Relevant Time Period and in every year analyzed.

41. For example, in 2019, nine percent of City National's mortgage loan applications came from residents of majority-Black in Hispanic tracts, while City National's peers generated 47 percent of their applications from such tracts. Similarly, in 2020, while City National generated seven percent of its applications from majority-Black and Hispanic tracts, its peers generated 41 percent of their loans from these neighborhoods.

42. In other words, in 2019 and 2020, City National's peers generated between five and six times the number of mortgage loan applications from residents of majority-Black and Hispanic neighborhoods than did City National.

43. The statistically significant disparities between applications City National generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were residents in majority-Black and Hispanic areas in the Los Angeles MD who were seeking and applying for home loans. City National had no legitimate, non-discriminatory reason to draw so few applications from these areas.

44. These figures show a statistically significant failure by City National, relative to its peer lenders, to draw applications for home loans and provide residential mortgage

services to residents of majority-Black and Hispanic census tracts in the Los Angeles MD on a non-discriminatory basis from 2017 through 2020.

**F.      City National Made Disproportionately Low Number of Mortgage Loans in Majority-Black and Hispanic Neighborhoods of the Los Angeles MD**

45.     City National's lending practices have discouraged prospective applicants in majority-Black and Hispanic neighborhoods from seeking home loans. As a result, the Bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers from 2017 through 2020. *See* Exhibit C.

46.     City National made 6,182 residential mortgage loans in the Los Angeles MD from 2017 to 2020. Of those loans, seven percent were made to residents of majority-Black and Hispanic census tracts. By contrast, City National's peers made 44 percent of their residential mortgage loans to residents of majority-Black and Hispanic census tracts. In other words, these peer banks more than six times as many home mortgage loans in majority-Black and Hispanic census tracts than did City National.

47.     When the disparities were calculated for individual years, including 2019 and 2020, City National's peers made loans at a rate between six and seven times the rate of City National. The disparities are statistically significant across the Relevant Time Period and for each individual year from 2017 to 2020.

48.     The statistically significant disparities between the number of home loans City National made in majority-Black and Hispanic neighborhoods and those that its peers made show that there were residents in majority-Black and Hispanic areas in the Los Angeles MD who were seeking and qualified for home loans. City National had no legitimate, non-discriminatory reason to make so few home loans from these areas.

49.     These figures show a statistically significant failure by City National, relative to its peer lenders, to make home loans and provide residential mortgage services to residents of majority-Black and Hispanic census tracts in the Los Angeles MD on a non-discriminatory basis from 2017 through 2020.

50. Even when City National did make loans in tracts where the majority of residents are Black or Hispanic, it made those loans disproportionately to the white residents of those tracts. Between 2017 and 2020, City National originated only 113 loans to Black or Hispanic residents of majority-Black and Hispanic tracts, while making 176 loans to white residents of those tracts.

### G. City National Was Aware of and Failed to Respond to its Redlining Risk

51. During the Relevant Time Period, City National's internal fair lending oversight, policies, and procedures were inadequate to ensure that the Bank was positioned to provide equal access to credit to majority-Black and Hispanic neighborhoods in the Los Angeles MD. Moreover, City National's staffing was insufficient to implement a fair lending program commensurate with the size, complexity, and risk profile.

52. During the Relevant Time Period, the Bank's fair lending oversight was centralized under the supervision of a fair lending officer who received no training on redlining and did not discuss fair lending issues or concerns with anyone in the business divisions that originate or process residential loan applications.

53. Since at least 2015, City National's fair lending officer prepared reports detailing the Bank's fair lending risk. Each year, these reports showed that the Bank lent overwhelmingly to white, non-Hispanic individuals and described City National's fair lending risk as "high" or "increasing."

54. City National's assessments and reports also contained evidence of lending disparities involving Black and Hispanic borrowers, as well as lending disparities in census tracts in which the majority of the residents are identified as a "minority."[2] City National's internal compliance reports for the Relevant Time Period all provide

---

[2] Majority-minority is a term of art generally used in redlining matters to refer to census tracts where the majority (over 50 percent) of people in that area are people of color. High-minority tracts refer to census tracts where over 80 percent of resident are people of color.

11

information that should have notified the Bank of its ongoing fair lending risks, including risks related to redlining.

55. For instance, City National's 2016 internal Fair Lending Risk Assessment described its aggregate fair lending risk as "high" and the direction of the risk as "increasing" due in part to redlining concerns.

56. An internal Redlining Risk Review dated April 2017 identified disparities in lending in high minority tracts, calculated based on the Bank's lending patterns across the United States. This report recommended that the Bank "enhance its marketing efforts for residential mortgages to increase its penetration in assessment areas and community outreach."

57. City National's 2018 and 2019 internal compliance reports indicate that the Bank knew that it was overwhelmingly receiving applications from, and lending to, white borrowers. In May 2018, City National found that, of the residential mortgage applications that the Bank received in 2017, only three percent were from Black applicants and two percent were from Hispanic applicants.

58. It was not until May 2020 that City National's first attempted to measure its lending in communities of color against that of its peers in the Los Angeles MD, its largest market. City National's May 2020 Redlining Risk Review showed statistically significant disparities in its 2018 mortgage lending in majority-minority census tracts in the Los Angeles MD compared with peers. Specifically, the Bank's internal analysis showed that while its peers received 51 percent of their applications from majority-minority census tracts in the Los Angeles MD, City National received only 27 percent of its applications from those tracts. Maps prepared as part of the 2020 Risk Review report indicate that in 2018, the Bank originated very few loans in portions of the Los Angeles MD with majority-minority populations.

59. During the Relevant Time Period, City National has taken no meaningful action in response to the aforementioned analyses indicating that it was underserving

Black and Hispanic borrowers and majority Black and Hispanic neighborhoods, despite having knowledge of its underperformance and its redlining risk.

60. City National's Board and senior management did not exercise sufficient oversight to ensure fair lending risk management practices were effective and commensurate with the bank's size, complexity, and geographic expansion. Neither City National's fair lending officer nor anyone else in the Bank's compliance department, reported the Bank's fair lending and redlining risk to the Bank's senior management, the Board of Directors and/or management in divisions responsible for mortgage lending. Nor did City National maintain any internal oversight committees to review fair-lending efforts or determine if the Bank was generating loans in majority-Black and Hispanic neighborhoods.

61. City National did not incorporate fair lending considerations in its marketing decisions, nor in its decisions related to development of new loan products and services, nor did it make sufficient efforts to address its redlining risk.

62. City National's discriminatory practices as described herein have intended to discriminate and have had the effect of discriminating on the basis of race, color, and national origin.

## V. COUNT I – DISCRIMINATION ON THE BASIS OF RACE, COLOR, AND NATIONAL ORIGIN

63. The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

64. Persons who have been victims of City National's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i) and 15 U.S.C. §1691e(i), and may have suffered damages as a result of the Bank's conduct in violation of both the Fair Housing Act and the Equal Credit Opportunity Act, as described above.

65. Defendant City National Bank's actions as alleged herein constitute:
    a. Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the

        terms of conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. §3605(a), and its implementing regulations, 24 C.F.R. §§ 100.110(b), 100.120;

    b.    The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3);

    c.    Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65; and

    d.    Discrimination against applicants with respect to credit transactions on the basis of race, color, and national origin and discouragement of applications on the basis of race, color, and national origin in violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691(a)(1), 1691e(g), and its implementing regulations, 12 C.F.R. pt. 1002.

## VI.   COUNT II – PATTERN OR PRACTICE OF DISCRIMINATION AND DENIAL OF RIGHTS TO A GROUP OF PERSONS

66.    The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

67.    Persons who have been victims of City National's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i) and 15 U.S.C. § 1691e(i), and may have suffered damages as a result of the Bank's conduct in violation of both the Fair Housing Act and the Equal Credit Opportunity Act, as described above.

68.    Defendant City National Bank's policies and practices as alleged herein constitute:

        a.    A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, 42 U.S.C. § 3614(a), and the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(h); and

        b.    Unlawful discrimination and a denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance within the meaning of 42 U.S.C. § 3614(a).

69.    The discriminatory policies and practices of Defendant City National Bank have been intentional and willful and implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

## VII.   REQUEST FOR RELIEF

WHEREFORE, the United States prays that the Court enter an order that:

(1)    Declares that the conduct of Defendant City National Bank violates the Fair Housing Act;

(2)    Declares that the conduct of Defendant City National Bank violates the Equal Credit Opportunity Act;

(3)    Enjoins Defendant, its agents, employees, and successors, and all other persons in active concert or participation with Defendant, from:

        a.    Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

        b.    Discouraging applicants on account of race, color, or national origin;

        c.    Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

        d.    Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all

segments of Defendant's market areas are served without regard to prohibited characteristics;

(4) Awards monetary damages against Defendant in accordance with 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(5) Assess a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6) Awards the United States any additional relief the interests of justice may require.

## VIII. DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 12, 2023

Respectfully submitted,

MERRICK B. GARLAND
Attorney General

E. MARTIN ESTRADA
United States Attorney
Central District of California

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

SAMEENA SHINA MAJEED
Chief, Housing and Civil
Enforcement Section

RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section, Civil Division

JON M. SEWARD
Principal Deputy Chief, Housing and Civil
Enforcement Section

/s/ Katherine M. Hikida
KATHERINE M. HIKIDA
Assistant United States Attorney
Civil Rights Section, Civil Division

/s/ Sara L. Niles
SARA L. NILES
/s/ Kinara A. Flagg
KINARA A. FLAGG
Trial Attorneys
United States Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section
*Attorneys for the United States of America*